**SIGNED this 04th day of June, 2007.**

_____

**FRANK R. MONROE**
**UNITED STATES BANKRUPTCY JUDGE**

_____


UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
IN RE:                          )
                                )
RICHARD GERALD BARNES           ) CASE NO. 06-10396-FM
MARIA ANGELICA BARNES           )
                DEBTORS         ) (Chapter 7)
_____ )
FRANKLIN BANK, S.S.B.           )
                PLAINTIFF       )
VS.                             ) ADVERSARY NO. 06-1188-FM
                                )
RICHARD GERALD BARNES           )
                DEFENDANT       )
```

### MEMORANDUM OPINION

_____The Court held a trial on the above entitled adversary proceeding on February 14 and 15, 2007.  This is a core proceeding under 28 U.S.C. §157(b)(2) and deals with whether Richard Barnes (the "Debtor") is entitled to a discharge under 11 U.S.C. §727 and the dischargeability of the Debtor's indebtedness to the Plaintiff (the "Bank") under 11 U.S.C. §523(a)(4) and (6).  This Court has

1

the jurisdiction to enter a final order under 28 U.S.C. §1334(a) and (b), 28 U.S.C. §157(a) and (b)(1), 28 U.S.C. §151 and the Standing Order of Reference of all bankruptcy matters to this Court by the United States District Court for the Western District of Texas.  This Memorandum Opinion is being issued as Findings of Fact and Conclusions of Law in accordance with Bankruptcy Rule 7052.

<u>**Statement of Facts**</u>

The facts established at the trial of this case paint a very strange picture.  On the one hand, we have the Debtor in a most cavalier manner disposing of assets of Mobar, LLP, an entity which he and his wife wholly owned, and which assets served as collateral for the Bank.  On the other hand, we have the Bank who appears unable to obtain any timely response from the Small Business Association ("SBA") with regard to Debtor's desire to self-liquidate.

The business of Mobar, LLP was rapidly declining in the spring of 2005.  The inventory of the Guadalupe store was seriously depleted and Mobar was by June 2005 in a position where it had few, if any, resources with which to keep its stores appropriately stocked.  The Debtor requested a meeting with Richard Waite and Robert Rhoades, representatives of the Bank, in early June 2005. The meeting actually occurred June 24, 2005.  At that time, the Debtor informed Rhoades and Waite of the need to sell the stores due to probable legislative action which would result in the loss

2

of his wholesale business to restaurants and bars.  The Debtor alleges that he told the Bank at that meeting that the sale of the stores would not fully cover the debt.  He also claims to have told the bankers that from the sale of the Guadalupe store, the Bank would probably net only $50,000.00.  This is disputed by the Bank. In fact, Waite prepared an Asset Review Form from Rhoades' notes of the meeting with Barnes on the 24th.  That form contained the following statement, "Richard Barnes has approached the Bank and is planning to sell the business to Twin Liquors.  The proposed sales price is $555,000.00.  The sale is being brought on by a recent change in law related to wholesale liquor business which has resulted in a 50% decline in the value of his business".  See Bank Exhibit 116.  However, the Debtor failed to tell them that on June 16, 2005, he had already turned the servicing of the wholesale accounts of the Guadalupe store over to Twin Liquors.  At the meeting the bankers told the Debtor that SBA approval would be required before he could take any action.  The Debtor's response was that he needed to have an answer by August 1.  The Bank gave him no assurances.

The Debtor then did an incredible thing.  He signed an Asset Purchase Agreement on June 28, 2005 with Twin Liquors for the Guadalupe store.  Bank's Exhibit 112-Depo. R. Barnes-Exhibit 5 attached.  The price was $225,000.00 plus the cost of the inventory.  An initial down payment of $175,000.00 was made which

the Debtor used to pay third party liquor suppliers.[1]  The $50,000.00 balance was for the wholesale accounts but could be adjusted depending on the exact number of wholesale accounts to be transferred at closing.  He did not tell the Bank what he had done.

Finally, on July 5, 2005, the Debtor sent a letter to the SBA in care of the Bank informing them of what he had done. Specifically, he disclosed that the $175,000.00 had been used to pay liquor suppliers and that out of the balance to be paid at closing the Bank would receive $50,000.00.  In that regard he advised them that the amount to be paid for the inventory would also have to be used to pay off liquor suppliers.

The Bank received the letter on July 10 and requested Phillip Weaver, a senior vice president with experience in SBA loans, be involved.  On July 11, Mr. Weaver faxed the SBA a copy of the Debtor's letter with the request that the SBA purchase the outstanding participation on the note.

The Bank disputes that the Debtor ever told them about the pending sale before it occurred or that he ever told them about the need to use the majority of the proceeds to pay liquor suppliers prior to the July 5 letter.  Nevertheless, after receipt of the

---

[1]Although ¶2.5 of the Asset Purchase Agreement set forth purchase price allocations for FFE, vehicles, inventory and goodwill, none of the blanks were completed and no evidence was presented with respect to any of the $175,000 being allocated to inventory, goodwill, FFE, etc. There was $159,456.61 paid for inventory and $20,000 paid for the wholesale accounts at the closing on August 18 and an additional $35,000 payment reallocated from an employment contract.

4

July 5 letter, the Bank checked with their counsel to verify the propriety, or impropriety, of the Debtor's action in paying the suppliers.  The Bank's counsel by e-mail dated August 16, 2005 verified that the Debtor's use of the proceeds were valid under the Texas Alcoholic Beverage Code Sections 1002.31 and .32 "if he wanted to stay in business".  See Bank's Exhibit 72.

Mobar, however, was not going to stay in business.  The Guadalupe store location was going to stay in business but under new ownership – Twin Liquors.  It was, however, the Debtor's understanding that he had to pay the liquor suppliers in order to be in full compliance with his Asset Purchase Agreement with Twin Liquors.  Additionally, it would appear that the $175,000.00 did not represent proceeds of the liquor inventory or FFE of the Bank although it is most likely covered by the Bank's lien against Mobar's "general intangibles".  Bank's Exhibit 2. In any event, it is clear that the Bank was totally cut out of Mobar's sales transaction with Twin Liquors even though the Debtor had been told prior to his signing the same that SBA approval would be required. The fact is that we do not know what would have resulted if the Bank had been kept fully informed and been included in the negotiations with Twin Liquors which in most cases where property is collateralized is standard procedure.

Twin Liquors and Mobar took an inventory of the Guadalupe store location on August 16, 2005 in order to close the remainder

5

of the transaction.  At that time, the Debtor knew he still did not have SBA approval.  Nevertheless, on August 18, 2005, he closed the sale.  Twin Liquors' president, David Jabour, testified that the Asset Purchase Agreement required the property to be delivered free and clear of liens and that he understood from the Debtor by the end of the day that everything was okay.  This is so even though the Debtor clearly knew he did not have SBA approval.

The Debtor received two checks at closing, one in the amount of $20,000.00 for the wholesale accounts and one in the amount of $194,456.61.  This had two components.  One was for the inventory of $159,456.61.[2]  The other was $35,000.00 which David Jabour, President of Twin Liquors, testified was reallocated from an employment contract with the Debtor because that money was needed to close the deal.  The existence of this employment contract was apparently never disclosed to the Bank and is not otherwise mentioned in testimony.  All funds from the closing received by Mobar were used to pay liquor suppliers' bills.  No funds ever went to the Bank from the sale of the Bank's collateral.  This all occurred in spite of the fact that the Debtor knew that the SBA had never approved the transaction.  In fact, the SBA ultimately disapproved the transaction after it had actually occurred. Incredibly, Mr. Weaver testified as to a conference call between

---

[2]There was no evidence that this $159,456.61 did or did not include any payment for FFE.

himself, the Debtor, and the SBA representative on August 18, the very day of the sales' closing, with reference to the SBA's position and the fact that the SBA wanted more information. Those requests were actually faxed from Mr. Weaver to the Debtor at 4:58 p.m. that very day. At no time during this exchange of information between the Bank, the SBA, and the Debtor did he ever inform them that he was in the process of closing the sale that very day. And, he kept trying to get SBA approval even after the closing without telling anyone, the Bank or the SBA, that the sale had already been consummated and all the proceeds were gone. Finally, on September 1, the SBA said that it would not agree to the proposed self-liquidation by Mobar and authorized the Bank to institute litigation.

The first time the Bank and the SBA learned that the sale had been actually closed was after litigation had been commenced against the Debtor and Mobar.

Clearly, the Debtor engaged in a scheme to deceive the Bank and the SBA with regard to the sale of the Guadalupe store to Twin Liquors. The question that remains is whether his actions fit within the parameters of any of the causes of action brought herein by the Bank and the extent that his actions caused damage to the Bank.

The Bank sued Twin Liquors and received $100,000.00 in settlement of that litigation. Attorneys fees incurred by the Bank

7

in that litigation totaled $39,754.46 and costs totaled $10,066.94. That leaves a net recovery from Twin Liquors of $50,178.60.

On August 8, 2005, at the request of the Bank, Mickey Davis conducted an appraisal of the assets in the Guadalupe store. His resulting value was $72,575.00 ($65,000.00 for inventory and $7,575.00 for FFE) as is, where is, with no deduction for costs of sale or relocation. Bank Exhibit 95. Greg Shattuck provided an appraisal as well.  For FFE the liquidation value was $8,800.00. Bank Exhibit 99.  Inventory was valued at approximately $90,900. Bank Exhibit 97.  After moving and auction expenses of $11,000(not including auctioneer commission), net inventory proceeds estimated to be $79,900.   Total of FFE and inventory is $88,700 less auctioneer's commission.   So, we know that if the Bank had closed the store down and liquidated their collateral themselves in August 2005, they might have received somewhere in the neighborhood of $65,000 to $75,000.00 to apply against the debt.

The inventory was actually sold for $159,456.61. Against that number, the Bank recovered from Twin Liquors the net amount of $50,178.60.  So, from the Debtor's liquidation of the inventory collateral, the Bank is short $109,278.01.  The Bank also had a lien on the $20,000.00 Mobar received from the sale of the wholesale accounts under its Security Agreement[3].  So, its total

---

[3]The additional $35,000 paid by Twin Liquors was reallocated from an employment agreement, and there was no evidence presented that the Bank had a lien on this amount.

8

loss from Mobar's disposition of its inventory and accounts was $129,278.01.

## Issues

_____1.  Did the Debtor's use of the proceeds from the sale of the Guadalupe store constitute embezzlement in the context of 11 U.S.C. §523(a)(4)?

2.  Did the Debtor's use of the proceeds from the sale of the Guadalupe store constitute a wilful and malicious injury to the property of the Plaintiff within the meaning of 11 U.S.C. §523(a)(6)?

3.  Did the Debtor's use of the proceeds from the sale of the Guadalupe store constitute a transfer of property of an insider, Mobar LLP, with the intent to hinder, delay or defraud the Bank within the meaning of 11 U.S.C. §§727(a)(2) and (7)?

4.  What are the Bank's damages, if any?

## Conclusions of Law

1.  11 U.S.C. §523(a)(4).  Debts that are created out of "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" are excepted from discharge.  11 U.S.C. §523(a)(4)(West 2007).

The Bank has alleged that the Debtor, individually and acting on behalf of Mobar, embezzled the proceeds from the sale of the Guadalupe store.  Embezzlement has been defined as "the fraudulent appropriation of property by a person to whom such property was

9

intrusted or into whose hands it has lawfully come." *In re Weber,* 892 F.2d 534, 538 (7th Cir. 1989) (quoting *Moore v. United States,* 160 U.S. 268, 269, 16 S.Ct. 294, 40 L.Ed. 422 (1985).  In this regard the Fifth Circuit has held "[t]he plain language of the statute and limited evidence of Congressional intent indicate that the pertinent debt discharge exception was intended to reach those debts incurred through abuses of fiduciary positions and <u>through active misconduct</u> whereby a debtor has deprived others of their property <u>by criminal acts</u>; both classes of conduct involved <u>debts arising from the debtor's acquisition or use of property that is not the debtor's</u>."  *Matter of Boyle,* 819 F.2d 583, 588 (5th Cir. 1987)(emphasis added).

The pertinent language in the Security Agreement relied on by the Bank reads "OWNERSHIP AND DUTY TO PROPERTY: ... I will not try to sell the property unless it is inventory or I receive your written permission to do so.  If I sell the property I will have the payment made payable to the order of you and me."  This provision of the security agreement obviously applies to sales of inventory out of the ordinary course of business.  It is without dispute that the Debtor did not get the written permission of the Bank or the SBA to the sale of the Guadalupe store.  It is likewise uncontested that he did not have the payment he received made payable to the order of Mobar and the Bank.

10

The legal question is whether the Debtor's conduct in selling the Bank's collateral and not remitting the proceeds constitutes embezzlement.  Although courts have differed in answering this question, the majority opinion is that "where a creditor holds nothing more than a security interest in a debtor's property, the relationship is insufficient to support a finding of embezzlement." *In Re: Moller,* 2005 W.L. 1200916 (Bankr. N.D. Ia. 2005)(stating, "As owner of the collateral, the debtor remained the owner of its proceeds, even though both the collateral and its proceeds were subject to a security interest.  No person can embezzle from himself." (citing *In re: Contella,* 166 B.R. 26, 30 (Bankr. W.D.N.Y. 1994)))*; In re: Phillips,* 882 F.2d 302, 303-05 (8th Cir. 1989)(finding a security interest does not rise to the level of ownership sufficient to support a claim for embezzlement); *In re: Tinkler,* 311 B.R. 869, 877 (Bankr. D. Colo. 2004)(holding that a parties' contract did not grant lender an ownership interest in proceeds from sale of inventory, but only a security interest, of kind insufficient to support "embezzlement" claim).  But see contra, *In re: Hoffman,* 70 B.R. 155, 163 (Bankr. W.D. Ark. 1986)(Debtor's conversion of bank's collateral as embezzlement). *In re: Harrell,* 94 B.R. 86, 91 (Bankr. W.D. Tex. 1988)(debt was ultimately dischargeable, however, finding that debtor who sold collateral "appropriated" creditor's property by failing to "immediately and directly remit. . .the proceeds of the sale" to

the creditor).

Upon reflection, this Court believes that the proper application of the term "embezzlement" within the context of 11 U.S.C. §523(a)(4) is that an owner of collateral, when he sells the collateral and fails to remit the proceeds to the lienholder, has not embezzled funds from the lienholder. "No person can embezzle from himself." *In re: Contella* at 30. It was not the security interest of the Bank that was in the hands of Mobar. It was property of Mobar in the hands of Mobar which the Debtor sold. Clearly, the Debtor, acting through Mobar, willingly breached the provision of the security agreement requiring the Bank's approval of the sale and the receipt of a joint payee check for the proceeds of the sale. He additionally breached his agreement by using the proceeds for purposes other than paying the Bank. However wrong that action was, it does not constitute embezzlement.

2. 11 U.S.C. §523(a)(6). Debts that arise from, "wilful and malicious injury by the debtor to another entity or the property of another entity" are non-dischargeable in bankruptcy. 11 U.S.C. §523(a)(6)(West 2007).

The United States Supreme Court has stated that for the injury to be wilful it must be, "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61-62, 118 S.Ct. 974, 140 L.Ed.2d 90(1998). The Fifth Circuit Court of Appeals has interpreted

12

§523(a)(6) in light of the Supreme Court's decision in the *Kawaauhau case.* The Fifth Circuit aggregates the words "wilful and malicious" into a unitary concept because "treatment of the phrase as a collective concept is sensible given the Supreme Court's emphasis on the fact that the word they modify is 'injury'." *In re: Miller,* 156 F.3rd 598, 606 (5th Cir. 1998). The inquiry required under the *Miller* decision in determining whether an injury is "wilful and malicious" is to examine the evidence to see if "there is either an objective substantial certainty of harm or a subjective motive to cause harm" in the actions of the debtor of which the creditor complains. Id. "If the creditor can show that debtor deliberately and intentionally failed to remit proceeds of collateral to a secured party, as required under a security agreement, the creditor may be able to prevail on a claim of non-dischargeability under §523(a)(6)." *In re: Rodriguez,* 2007 Bankr. LEXIS 547, ** 20-21 (Bankr. S.D. Tex. Houston 2007)(citing *Mabank Bank v. Grisham,* 245 B.R. 65, 73-74)(Bankr. N.D. Tex. 2000)). "Malice as required under §523(a)(6) may be inferred if the debtor acts 'in a manner which one knows will place a lender at risk such as converting property in which the lender holds a security interest ... " *Mabank* citing *In re: Therous,* NL. 94-50530, 1995 WL 103342, *3 (5th Cir. Feb. 27, 1995)(citing *Crysler Credit Corp. v. Perry Chrysler Plymouth, Inc.,* 783 F.2d 480 (5th Cir. 1986)). In *Rodriguez* the Court went on to state, "When a debtor is an

13

experienced businessman, it may be reasonable to infer that the debtor knows that the disposing of collateral will 'jeopardize' the lender's security interest." *Therous* at *3.

The Debtor's actions taken as a whole from June 24, 2005 (the date of his first meeting with Bank officials) through his final closing of the sale of the inventory on August 18, 2005 (when he knew he did not have either the Bank's or the SBA's approval, and he used all of the proceeds of the Bank's collateral to pay unsecured liquor suppliers) shows that he objectively knew that there was a substantial certainty of harm to the Bank by those actions.  This cannot reasonably be contested.  Throughout that time period, the Debtor actively misled the Bank by not divulging to them the totality of his actions while he was at the same time requesting their consent.  He did not tell them of the receipt and disposition of the $175,000.00 until after it had occurred.  He did not tell them that he had closed the final portion of the sale - ever.  And, he continued to seek the Bank's and SBA's approval for the sale even after he had closed the sale and even though he had not told them that the sale had closed.  The Bank and the SBA only learned of the ultimate closing of the sale after the Bank instituted litigation against Mobar and the Debtor to recover upon its collateral and its debt.  It is clear to this Court that the Debtor's actions injured the Bank and that the Debtor knew that his actions would result in harm to the Bank.  Selling the Bank's collateral and paying the proceeds to someone else without their

knowledge or consent is, in this case, a clear violation of §523(a)(6) within the definition of "wilful and malicious" as defined by the Fifth Circuit in the *Miller* case. This is especially true since he knew at closing there were not funds available to pay the Bank.

3.  11 U.S.C. §727(a)(2) and (7). The Bank claims that the Debtor's actions as outlined above show that he transferred, removed, destroyed, mutilated, or concealed property of a debtor (Mobar LLP) of which he was an insider with the intent to hinder, delay, or defraud the Bank. Neither party was able to find a case from the Fifth Circuit on point.

The Debtor was clearly an insider of Mobar LLP. Mobar LLP filed its own Chapter 7 bankruptcy case in this Court on January 27, 2006.

The issue at hand is one of the Debtor's intent. Most of the cases under these Code sections deal with a debtor converting non-exempt property into exempt property within one year of the bankruptcy filing or otherwise secreting property from creditors with the intention of retaining it. See, for example, *Matter of Swift,* 3 F.3rd 929 (5th Cir. 1993); *Matter of Bowyer,* 916 F.2d 1056 (5th Cir. 1990); *Matter of Reed,* 700 F.2d 986, 99-91 (5th Cir. 1983). These cases are factually different than the case at bar. Here, the Debtor did not hide or secrete any of his property or convert any of his non-exempt property to exempt property all with the intention of putting it beyond his creditors' reach. He sold

15

property of Mobar LLP, of which he was an insider, without obtaining the required permission of the Bank and SBA, and he used all of the proceeds of their collateral to pay Mobar's unsecured liquor suppliers.

If one is to believe the Debtor's testimony, at least with regard to the first half of the sale transaction, it was his hope that by entering into the transaction with Twin Liquors, the Bank would ultimately be paid $50,000.00. It was also his understanding that since Twin Liquors would be continuing in business at the same location, Mobar was required to pay its liquor suppliers under relevant state statutes. And, the agreement with Twin Liquors required the same. Additionally, the initial $175,000.00 payment was not for the purchase of inventory. It was part of the purchase price for the right to do business at the Guadalupe store location. Technically, it most likely was the Bank's collateral as an "intangible" under the security agreement, but the Debtor's actions at this time alone do not prove an intent to hinder, delay or defraud the Bank even though he did not disclose to the Bank what he had done until two weeks or so after the fact.

The second half of the transaction, the final closing of the sale with the payment of the remainder of the purchase price is more problematic. Here it is clear that the Debtor actively misrepresented the facts to the Bank and the SBA. The Debtor's explanation is likewise perplexing. He consistently testified that in entering into and consummating the sale transaction with Twin

16

Liquors, his sole intent was to get the Bank some money to apply on the debt.  However, the actual facts belie his testimony.  First, he entered into the sales transaction without telling the Bank and after having been told that the SBA would have to approve any such transaction.  Second, he took the initial $175,000.00 payment and paid Mobar's unsecured liquor suppliers without telling the Bank.  Third, he only sought approval of the transaction after he had entered into it and after the $175,000.00 was gone.  Fourth, he never disclosed the fullness of the transaction to the Bank and the SBA.  Fifth, he closed the transaction knowing the Bank and the SBA had not agreed.  Sixth, Mobar received $214,456.61 at the closing all of which the Debtor caused Mobar to disburse to entities other than the Bank.  Seventh, and perhaps the most damaging evidence of all is that on the very day that the Debtor closed the sale to Twin Liquors, August 18, 2005, he participated in a conference call with representatives of the Bank and the SBA and he failed to disclose to them what was transpiring even though the substance of the call was the "proposed" sale itself.  Additionally, in response to the request for information he received via e-mail from the Bank at 4:58 p.m. that very day as a result of the telephone conference, he faxed the Bank the requested information the very next day on August 19, 2005.  All of this information is contained in Exhibit D-11.  The last page of D-11 contains the Debtor's estimates of what the sales proceeds from the closing of the sale would be.  That estimate is clearly false as it contains no projected amount

from the sale of the inventory even though the sale has just occurred. The only amount reflected as remaining owed is the $50,000.00 to be paid at closing. The obvious purpose of the Debtor's use of this "estimate" is to show the Bank receiving $50,000.00 at the closing-something he then knew to be false. This is exceptionally damaging evidence.

But what could have been the motivating factor for the Debtor to have closed the sale in such a manner. After all, he was to get none of the proceeds personally, was he? Well, he hoped he would. He apparently had a side employment agreement with Twin Liquors which would pay him $50,000.00 according to Mr. Jabour's testimony. This was a fact he never disclosed to the Bank or the SBA in any of the information he sent to them. As it turns out, $35,000.00 of that amount was reallocated to the sales closing so there would be enough money to pay the liquor suppliers. And, whether he ever got the remaining $15,000.00 is unknown. The other reason was that he was trapped. He had entered into a binding contract with Twin Liquors, taken the initial $175,000.00 payment and spent it by paying liquor suppliers. He had no way to pay it back. So, instead of making full disclosure to all parties, he chose to close the sale without Bank/SBA approval and he represented to Twin Liquors that he had their consent; something that ended up costing Twin Liquors $100,000.00 plus its attorney's fees in defending the lawsuit the Bank brought against it. So, the Debtor ended up defrauding not only the Bank but Twin Liquors as well.

Under the circumstances it is hardly a stretch to conclude that the Debtor, as an insider of Mobar LLP, also a debtor, caused Mobar to transfer property of Mobar within one (1) year of the filing of Mobar's bankruptcy petition, with the actual intent to hinder, delay and defraud the Bank. His discharge will therefore be denied under 11 U.S.C. §727(a)(2) and (7).

4.  <u>Damages</u>.  Debtor argues that the damages the Bank suffered, if any, should be calculated in the following manner. The appraisals of Mickey Davis and Greg Shattuck reflect that had the Bank liquidated the inventory and FFE at the Guadalupe store, it would have received somewhere between $65,000.00 to $75,000.00. The Bank actually recovered from Twin Liquors the net amount of $50,178.60. Therefore, the only damages to which the Bank should be limited is the difference in those numbers, approximately $15,000.00 to $25,000.00.

It does not, however, seem appropriate to reward the Debtor for his malfeasance. In fact, the inventory sold in August for $159,456.61  Against that number, the Bank recovered from Twin Liquors after attorneys' fees and costs the net amount of $50,178.60. With regard to the Debtor's liquidation of the Bank's inventory collateral, the Bank is short $109,278.01. In addition, Mobar's wholesale accounts were sold to Twin Liquors as well for an additional $20,000.00. These "accounts" are clearly covered by the Bank's security interest. Accordingly, at a very minimum, the Bank should be entitled to recover $129,278.01 in damages under 11

19

U.S.C. §523(a)(6).[4]

The next inquiry is to what extent the Bank should be able to recover the initial $175,000.00 payment made by Twin Liquors to Mobar on June 28, 2005 which the Debtor caused Mobar to disburse to pay all third party liquor suppliers.  The right to do business at the Guadalupe store is clearly an intangible that Mobar owned and sold and that was covered by the Bank's security interest. Bank Exhibit 2.  Debtor clearly caused Mobar to sell that asset and disburse the funds to suppliers rather than the Bank.  And, such activity occurred after the Debtor's meeting with Mr. Waite and Mr. Rhoades at which time the bankers informed him that he would need SBA approval to sell the store.  The Debtor did ultimately notify the Bank of this fact in his July 5, 2005 letter.  However, the Bank did not make an issue of this because the use of the proceeds were arguably valid under the Texas Alcohol Code Sections 1002.31 and .32 in order for Mobar to stay in business at that time.  And, of course, Mobar had to stay in business in order to consummate the sale to Twin Liquors.

Under these circumstances, the Court does not feel the $175,000.00 payment is an item which should be included in the calculation of damages regardless of the fact that the Debtor, at all times, took action without Bank approval when he knew he needed it.  The use of the $175,000.00 ultimately enabled Mobar to

---

[4]There is no additional amount awarded for FFE, as there was no evidence as to whether the FFE was or was not included in the initial $175,000, in the inventory payment of $159,456.61 or in the Twin Liquors' settlement payment.

consummate the sale and receive the money it received at the closing on August 18.  It is those monies received at the closing that should be used as the proper measure of damages under this very special set of factual circumstances.

<u>Exemplary Damages</u>

A bankruptcy court may rely on state law to award exemplary damages where the Bankruptcy Code does not specifically allow such measures.  *In re: Landmark Equity Corp.,* 83 B.R. 362, 382 (E.D. Va. 1987).  Under Texas law, courts of equity have the power to assess exemplary damages.  *In re: Performance Nutrition, Inc.,* 239 B.R. 93, 115 (Bankr. N.D. Tex. 1999).  Bankruptcy courts are courts of equity.  *United States v. Energy Resources Co.,* 495 U.S. 545, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990).

Because the Bankruptcy Code does not expressly provide for exemplary damages under §523(a)(6), Section 41 of the Texas Civil Practice and Remedies Code governs the imposition of such an award. *In re: Landmark*, 83 B.R. at 376; Tex. Civ. Prac. & Rem. Code Ann. §41.003 (Vernon 1997 & Supp. 2007).

Exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the claimant's harm results from: (1) fraud; (2) malice; or (3) gross negligence.  Tex. Civ. Prac. & Rem. Code Ann. §41.003 (Vernon Supp 2007).  Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be

21

established.

The Bank alleges that malice or gross negligence apply in this situation. "Malice" means a "specific intent by the defendant to cause substantial injury or harm to the claimant." Tex. Civ. Prac. & Rem. Code Ann. §41.001(7) (Vernon Supp 2007). Specific intent means that "the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it." *Mission Resources, Inc. v. Garza Energy Trust,* 166 S.W.3d 301, 313 (Tex. App.–Corpus Christi 2005 (pet. filed) citing *Reed Tool Co. v. Copelin,* 689 S.W.2d 404, 406 (Tex. 1985). "Gross negligence" means an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety or welfare of others." Tex. Civ. Prac. & Rem. Code Ann. §41.001(11) (Vernon Supp. 2007). Gross negligence and malice may be proven by direct or circumstantial evidence. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 (Tex. 1994); *Behee v. Missouri Pac. Ry. Co.,* 71 Tex. 424, 429, 9 S.W. 449, 450 (Tex. 1888).

Punitive (or exemplary) damages are levied against a defendant to punish the defendant for outrageous, malicious, or otherwise morally culpable conduct. *Southern Cotton Press & Mfg. Co. v.*

*Bradley,* 52 Tex. 587, 600-601 (1880)(citations omitted). See Tex.
Civ. Prac. & Rem. Code §41.001(5)(Vernon Supp. 2007)(defining
"exemplary damages" as "any damages awarded as a penalty or by way
of punishment"). The legal justification for punitive damages is
similar to that for criminal punishment and like criminal
punishment, punitive damages require appropriate substantive and
procedural safeguards to minimize the risk of unjust punishment.
*Transportation Insurance Company v. Moriel,* 879 S.W.2d 10 (1994).
The *Moriel* case reiterates what the Texas Supreme Court has said
many times before:

> The fact that an act is unlawful is not of itself ground
> for an award of exemplary or punitive damages. The act
> complained of not only must be unlawful, but also must
> partake of a wanton and malicious nature, or as sometimes
> stated, somewhat of a criminal or wanton nature.

*Jones v. Ross,* 141 Tex. 415, 173 S.W.2d 1022 (1943) restated in
*Ware v. Paxton,* 359 S.W.2d 897 (1962) and again in *Dennis v. Dial
Finance & Thrift Company,* 401 S.W. 2d 803 (1966).

Although this Court finds the Debtor committed a wilful and
malicious injury to the Bank within the *Miller* court's definition
of "wilful and malicious" as a unitary concept, the Court does not
believe that the Bank produced clear and convincing evidence that
the Debtor's culpability and actions in this case rise to the
appropriate level for punishment by an exemplary damage award.

Accordingly, the damages "for wilful and malicious injury by
the debtor to the property of another entity", in this case the
Bank, will be set at $129,278.01.

<u>Attorney's Fees</u>

The Bankruptcy Code does not expressly award attorneys' fees to a creditor who successfully contests the dischargability of the creditor's claim or the denial of a debtor's discharge.  The Bank contends that because the notes and security agreements the Debtor signed contain provisions wherein the borrower agrees to pay attorneys' fees as part of collection costs, the Bank is entitled to such.

The Fifth Circuit has held in certain dischargeability actions that a creditor can recover fees only when provided by a contract between the debtor and the creditor enforceable under state law. *Matter of Luce,* 960 F.2d 1277, 1286 (5th Cir. 1992); *Jordan v. Southeast Nat'l Bank (In re Jordan),* 927 F.2d 221 (5th Cir. 1991) However, in both these cases the court excepted from discharge the whole of a debt fraudulently incurred under §523(a)(2) as the entirety of such debts would include state-approved contractually required attorneys' fees.  *See also, Davidson v. Davidson,* 947 F.2d 1294, 1298 (5th Cir. 1991)(following *Jordan* holding that "where a party has contracted to pay attorneys' fees for the collection of a nondischargeable debt, the fees also will not be discharged in bankruptcy" in a §523(a)(5) alimony case).

The Court does not read these cases to allow attorneys' fees in every dischargeability cause of action where there is a contractual provision allowing attorneys' fees.  This is especially true where the non-dischargeable injury does not relate

24

specifically to the contract.  Where a plaintiff is harmed by the tortious, wrongful sale of encumbered property, the measure of the non-dischargeable injury under §523(a)(6) is the fair market value of the property when it is sold.  It has nothing to do with collection of a note or the debt.  As such, under §523(a)(6), there is no right to recover attorneys' fees.  In this situation the basis for determining the amount owed by the Debtor as non-dischargeable is not the notes and security agreements, but rather the value of the property on the date the Debtor sold it.  *See, The Magic Lamp, L.L.C. v. LeBlanc,* 346 B.R. 706 (Bankr. M.D. La. 2006).

However, the Court has also denied the Debtor's discharge making the entire debt owed to the Bank non-dischargeable.  Based on this discharge denial, the Debtor's debts in toto, including the contractual provisions between the Debtor and the Bank awarding attorneys' fees should be upheld.  Additionally, the Court will allow appropriate costs.  The Bank shall have additional time to file its request for attorneys' fees and costs relating solely to pursuing this adversary proceeding.  All other fees and costs related to attempts to collect upon its debt should be sought in conjunction with obtaining a judgment on its debt.

The Court will not enter a judgment until the Bank's request for attorneys' fees and costs has been resolved.

###